Filed 6/2/14  In re Adrian A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ADRIAN A., a Person Coming Under the Juvenile Court Law. | |
| | D064868 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3428A) |
| v. | |
| CANDICE A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Phillips, Chief Deputy County Counsel, and Daniela Davidian, Deputy County Counsel, for Plaintiff and Respondent.

This is an appeal from the juvenile court's order terminating Candice A.'s parental rights over her minor son Adrian A. under Welfare and Institutions Code section 366.26 (subsequent undesignated section references are to this code). Candice contends the court should have granted her petition to modify its earlier order removing Adrian from her custody, because she proved changed circumstances showing that returning him to her custody was in his best interests. (§ 388.) Candice also contends the court should not have terminated her parental rights, because termination was detrimental to Adrian by severing a beneficial parent-child relationship and by substantially interfering with the relationship with his half-sister Audriana. (§ 366.26, subd. (c)(1)(B)(i), (v).) We affirm.

I.

BACKGROUND

Upon petition of the San Diego County Health and Human Services Agency (the Agency) filed on July 7, 2011, the juvenile court removed 10-month-old Adrian from Candice's custody based on evidence Adrian had a swollen and discolored penis and bruises on his forehead, jaw, arm, chest, abdomen, and buttocks, which medical professionals considered suspicious for nonaccidental trauma. Candice, who was living with her father, his live-in girlfriend, and other family members at the time and had been Adrian's only caregiver for the past two weeks, had no satisfactory explanation for his injuries. The court ordered Adrian's detention and set the matter for a combined jurisdictional and dispositional hearing.

At the jurisdictional/dispositional hearing a month later, the juvenile court declared Adrian a dependent of the court and placed him in foster care. The court

2

ordered Candice be provided reunification services and visitation with Adrian, and scheduled six- and 12-month review hearings.

By the time of the six-month review hearing (Feb. 9, 2012), Candice's boyfriend had moved in with her and her family, and she was pregnant with his child. She was making progress in parenting classes and individual counseling, but she continued to deny any responsibility for Adrian's injuries and refused to believe anyone in her home would injure him. Candice thought her regular visits with Adrian were going well and that Adrian was "having fun," but she stated Adrian went to his foster mother when he became upset. The foster mother reported that Candice generally arrived on time; brought Adrian food, clothing, or toys; fed him; changed his diaper; and played with him. The foster mother expressed concern, however, that Candice could not always keep up with Adrian, and had difficulty saying "no" to him or calming him when he became unruly. Candice often expressed her frustration by calling Adrian "dork," "butt," "jerk," "weirdo," "dumb," "fatty," or "chubby." Although Adrian seemed to enjoy his visits with Candice, he would often look to his foster mother when he needed or wanted something, and he did not get upset when his visits with Candice ended. The Agency recommended that Adrian remain with his foster parents and that Candice receive an additional six months of visitation and reunification services. The juvenile court noted Candice had made substantive progress with her plan and adopted the Agency's recommendations.

By the time of the 12-month review hearing (Aug. 9, 2012), Candice had given birth to a daughter named Audriana and was living in an apartment with her boyfriend. Candice had successfully completed her parenting classes and was doing well in therapy,

3

but continued to believe Adrian's injuries were accidental and not caused by any family member. She continued to have regular visits with Adrian, which went well and became unsupervised in June. Candice's boyfriend and Audriana accompanied Candice to some of the visits; Adrian played with Audriana but was reluctant to play with Candice's boyfriend. After the unsupervised visits began, Adrian started acting out by biting his fingers and "head-butting" and throwing objects at his foster parents and family members. The Agency recommended that Adrian remain with his foster parents and that Candice receive six more months of visitation and reunification services. The juvenile court found that although Candice had made "significant progress" in resolving the problems that led to Adrian's removal, returning Adrian to her custody would create a substantial risk of detriment to him. The court continued Adrian's placement in foster care, ordered additional visitation and reunification services for Candice, and set an 18-month review hearing.

On August 27, 2012, the Agency learned Adrian suffered an injury to his chest. Candice reported her boyfriend might have "clipped" Adrian when placing him in a car seat. A physician concluded the lesion was a bite wound and was consistent with physical abuse. Candice's boyfriend told the social worker he "bit Adrian on accident." The social worker told Candice and her boyfriend he had to move out of the apartment, and Candice agreed she would not allow him back until the Agency had completed its investigation.

Based on the bite incident, Audriana was removed from Candice's custody and placed in the same foster home as Adrian. The Agency also petitioned the juvenile court

4

under section 388 to modify its previous orders by terminating reunification services and setting a permanency planning hearing for Adrian. The court denied the petition.

The 18-month review hearing began on February 22, 2013, and continued to March 4, 2013. The Agency reported Candice's visits with Adrian reverted to supervised after the bite incident. Candice appeared loving and caring toward Adrian and Audriana during the visits, but had difficulty controlling Adrian. For example, Candice was unable to discipline Adrian when he became aggressive with another child; and while Candice was tending to Audriana, Adrian often got away from her and on one occasion ran toward the street. Candice continued to participate in individual therapy and also started group therapy. Although Candice was motivated to become a better parent and to keep her children safe, she continued to minimize Adrian's injuries, expressed no empathy for Adrian, and denied her boyfriend intentionally injured Adrian. Based on Candice's lack of substantial progress after 18 months of reunification services and her repeated inability to protect Adrian from abuse, the Agency recommended Adrian remain in his current placement, reunification services be terminated, and a permanency planning hearing be set. The juvenile court adopted the Agency's recommendations.

On August 2, 2013, Candice petitioned the juvenile court under section 388 to modify its earlier orders by vacating the order setting the permanency planning hearing and returning Adrian to her custody. As changed circumstances justifying modification of the court's prior orders, Candice alleged she was continuing to have unsupervised visits with Audriana, had made sufficient progress in reunification services that Adrian could be safely returned to her and grow up with Audriana, and had not been in a

5

romantic relationship with her boyfriend for months. Candice further alleged the requested modifications would be in Adrian's best interests because he and Audriana had resided together most of their lives and should remain together, because Adrian knew Candice, and because she had made sufficient progress to be a protective parent for him.

The juvenile court held a combined hearing regarding Candice's section 388 petition and permanency planning on September 20 and October 15, 2013. The court received into evidence the Agency's report for the permanency planning hearing, two addenda to that report, and four letters Candice wrote as part of her group therapy in which she finally admitted her boyfriend abused Adrian and accepted responsibility for not protecting Adrian. The court also heard testimony from Candice's group therapist, her individual therapist, the social worker, Adrian's foster mother, and Candice.

In its report and addenda, the Agency recommended Adrian be freed for adoption. The Agency acknowledged Candice made "some progress" during the reunification period, but her progress was "very slow" and was accompanied by "plenty of denial and defensiveness." The Agency remained troubled by Candice's "disturbing lack of awareness and concern for Adrian's safety and injuries." In particular, the Agency disapproved of Candice's continued contact with her boyfriend, who was supporting her financially, living with Candice's father, and with whom she intended to coparent Audriana even after Candice admitted she suspected her boyfriend had caused Adrian's initial injuries. In the Agency's view, Candice's uncertainty about her relationship with her boyfriend and likely future contact with him posed a risk of physical harm to Adrian that should prevent his return to Candice's custody.

6

The Agency also stated Adrian was generally adoptable and his foster parents were interested in adopting him. The Agency pointed out that despite two years of visitation, Adrian was more strongly attached to his foster parents than to Candice. Adrian called his foster parents "mommy" and "daddy," but called Candice his "other mommy." Although in the past Adrian generally seemed to enjoy his interactions with Candice, in recent months he had become unwilling to talk to Candice when she telephoned and said he wanted to stay home when his foster mother prepared to take him to visit her. During recent visits, Adrian asked where his foster mother was and said he wanted to go home to his foster mother's house; and at the end of the visits, he was so happy to see his foster mother that he ran from Candice to greet her. The Agency also reported that if the foster parents were to adopt Adrian, they would allow Candice and Audriana to visit him. Based on the foregoing, the Agency recommended terminating Candice's parental rights and placing Adrian for adoption.

At the hearing, the court also heard live testimony. Candice's group therapist described Candice as "very eager to learn" and "on the road" to being a protective parent for Adrian, but she was "not there yet" and needed "at least three more months" of therapy. Candice's individual therapist testified that by the time of the hearing, Candice had gradually come to accept her boyfriend bit Adrian, had gotten out of her relationship with him, and was "definitely" able to protect her children from him.

The social worker also testified at the hearing. Based on her own observations and reports from Candice and Adrian's foster mother, the social worker stated that Adrian transitioned easily at the start of visits with Candice, that he had a "normal expected

7

sibling relationship" with Audriana, and that placing Adrian for adoption would not be detrimental to that relationship.

The foster mother testified she had been caring for Adrian in her home for approximately 26 months, loved him, and wanted to adopt him. The foster mother reported that recently Adrian had become "very possessive" of her, calling her "my mommy," not wanting to leave her to visit Candice, "ask[ing] a lot of questions about going home" when dropped off at school or for visits with Candice, needing reassurances that the foster mother would return, and not wanting to speak to Candice when she telephoned.

Finally, Candice testified. She stated Adrian "transition[ed] well" at the beginning of visits, was "more calm" when Audriana was not there, but was "a little more aggressive" when she was there. Candice further testified that she had met with her boyfriend two months before the hearing to discuss coparenting Audriana and that he was living with her father, but she was no longer in a romantic relationship with him and was no longer receiving financial support from him. Finally, Candice stated she learned to be a protective parent in her parenting classes and was "prepared for . . . whatever comes."

Based on the testimony and other evidence introduced at the hearing and the arguments of counsel, the juvenile court found Candice's circumstances had not changed and it would be detrimental to return Adrian to her custody, and denied her section 388 petition. The court also found by clear and convincing evidence that Adrian was adoptable, adoption was in his best interests, and none of the statutory exceptions to

8

adoption applied. The court terminated Candice's parental rights and referred Adrian for adoption.

Candice filed a notice of appeal from the order terminating her parental rights. A month later, the juvenile court in Audriana's dependency case ordered Audriana returned to Candice's custody. We take judicial notice of that order (Evid. Code, § 452, subd. (d)), and deny as unnecessary Candice's motion that we take additional evidence to include the order (Code Civ. Proc., § 909).

II.

DISCUSSION

Candice seeks reversal of the juvenile court's orders denying her section 388 petition and terminating her parental rights. As we discuss below, she has not shown reversible error.

A.    *Denial of Candice's Section 388 Petition*

Candice contends the juvenile court erroneously denied her section 388 petition, which sought to return Adrian to her custody and to vacate the order setting a permanency planning hearing. According to Candice, she proved that her circumstances had so changed that returning Adrian to her custody was in his best interests. We disagree.

The juvenile court may modify an order on petition of a parent if the parent shows by a preponderance of the evidence that there are changed circumstances or new evidence and that modification would be in the child's best interests. (§ 388, subd. (a); Cal. Rules of Court, rule 5.570(e)(1); *In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.) "The

9

petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) " ['] "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) "The denial of a section 388 [petition] rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.) This is not one of those rare cases.

The juvenile court reasonably found the circumstances had not so changed that the modifications requested in Candice's section 388 petition — returning Adrian to her custody and vacating the permanency planning hearing — should be made. Whether circumstances have changed so that a prior dependency order should be modified depends on the seriousness of the problem that led to the dependency and the extent to which the problem has been corrected. (*In re Amber M.*, *supra*, 103 Cal.App.4th at p. 685; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.) The problem that led to Adrian's removal from Candice's custody was very serious: her inability to protect Adrian from the physical abuse by a household member. The same problem recurred a year later when Candice's live-in boyfriend bit Adrian, even though in the interim Candice eagerly participated in therapy and parenting classes and made progress toward becoming an adequate parent. Indeed, Candice refused to believe her boyfriend bit Adrian, and continued to have contact with him and to accept financial support from him,

until shortly before the permanency planning hearing when it became clear she might lose custody of Adrian. "The fact that the parent 'makes relatively last-minute (albeit genuine) changes' does not automatically tip the scale in the parent's favor." (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.) Moreover, although Candice's individual therapist believed she was "definitely" able to protect Adrian from physical abuse, her group therapist believed she was "on the road" to becoming a protective parent for Adrian but was "not there yet." The juvenile court heard these witnesses and was entitled to reject the former testimony and credit the latter. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 48.) Since the record supported the conclusion that Candice's "circumstances were changing, rather than changed," the court did not err by denying her petition. (*Id.* at p. 49.)

The juvenile court also reasonably found the modifications requested in Candice's section 388 petition were not in Adrian's best interests. Where, as here, a parent's circumstances are merely changing and granting a section 388 petition would delay the selection of a permanent home for a child, granting the petition does not promote stability for the child or the child's best interests. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) Further, Candice filed the petition more than two years after Adrian had been removed from her custody, after she had been provided 18 months of reunification services, and less than two months before the scheduled permanency planning hearing. At that point in time, Adrian had developed a strong, loving bond to his foster parents, and his interest in domestic stability strongly outweighed any interest Candice had in the possibility of reunification. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 251-252.) "The reality is that childhood is brief; it does not wait while

11

a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it." (*In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038.) Adrian "should not be made to wait indefinitely for [Candice] to become an adequate parent." (*In re Anthony W.*, *supra*, at p. 252.) The juvenile court therefore did not err by denying Candice's section 388 petition as not in Adrian's best interests.

In urging us to reverse the juvenile court's denial of her section 388 petition, Candice relies on portions of the record favorable to her. Citing testimony from herself and her individual therapist, the Agency's reports, and the letters she wrote as part of her group therapy, Candice asserts she has finally accepted her boyfriend bit Adrian and she failed to protect Adrian from him; her participation in reunification services has prepared her to be an adequate mother to Adrian; and his "fierce bond" with her made it in his best interests to be returned to her custody. We agree there is evidentiary support in the record for these assertions. As we have discussed, however, the record also contains evidence that Adrian could not safely be returned to Candice's custody, and that during the time it took Candice to make the limited progress she made, Adrian had developed such a strong bond to his foster parents that it would not have been in his best interests to return him to Candice's custody and to delay the permanency planning hearing. It was for the juvenile court to assess the witnesses' credibility, to resolve evidentiary conflicts, and to draw the appropriate inferences. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319; *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 48.) The evidence amply supports the court's decision to deny Candice's petition.

Finally, we are not persuaded to reverse the juvenile court's decision by the cases Candice cites. The case on which she most heavily relies, *In re Kimberly F.*, *supra*, 56 Cal.App.4th 519, is readily distinguishable. There, the appellate court held the juvenile court abused its discretion by denying a section 388 petition seeking the return of two children when the problem that led to their removal from their mother's custody, unsanitary conditions in the home, had been corrected, and it was in the children's best interests to grant the petition because they had strong bonds to their mother and older siblings and were equivocal about being adopted. (*Id.* at pp. 525-526, 532-533.) By contrast, the problem at issue here, Candice's inability to protect Adrian from physical abuse, was much more serious and has not been completely corrected, and it was not in Adrian's best interests to grant Candice's petition. Also distinguishable is *In re Aljamie D.* (2000) 84 Cal.App.4th 424, where the issue was whether the mother's section 388 petition stated a prima facie case entitling her to a hearing. At the pleading stage, the mother "was not required to establish a probability of prevailing on her petition." (*Id.* at p. 432.) Here, Candice was past the pleading stage and was given a hearing on her section 388 petition, at which she had the burden of proof to establish her circumstances had changed and the requested modifications were in Adrian's best interests. (*In re Daniel C.*, *supra*, 141 Cal.App.4th at p. 1445.) After a full evidentiary hearing, the court reasonably determined Candice had not met that burden.

B.      *Termination of Candice's Parental Rights*

Candice also challenges the juvenile court's order terminating her parental rights and placing Adrian for adoption, contending these rulings were erroneous because she

13

proved the applicability of the beneficial parent-child relationship and sibling relationship exceptions to adoption. (§ 366.26, subd. (c)(1)(B)(i), (v).) We reject her contentions.

There is a strong statutory preference for adoption at the permanency planning hearing. (§ 366.26, subd. (c); *In re Celine R.* (2003) 31 Cal.4th 45, 53.) "Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified [exceptions] provides a compelling reason for finding that termination of parental rights would be detrimental to the child." (*In re Celine R.*, *supra*, at p. 53.) The parent has the burden to prove an exception applies. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) On appeal from an order terminating parental rights, we review the whole record for substantial evidence, i.e., evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find termination was appropriate based on clear and convincing evidence. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.)

Candice accuses the Agency of "float[ing] the proposition" that a parent must prove not only the applicability of the statutory exception on which the parent relies but additional "compelling reasons" not to terminate parental rights. We do not read the Agency's brief as advancing that proposition, and we need not decide whether the proposition is correct because, as we explain below, substantial evidence supports the juvenile court's determination that neither exception invoked by Candice applied.

1.    *Beneficial Parent-child Relationship*

Candice relies on the exception to adoption that applies when terminating parental rights would be detrimental to the child because "[t]he parents have maintained regular

14

visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  For this exception to apply, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.)  In an effort to establish her parental role, Candice points to evidence she visited Adrian regularly, and fed, changed, and played with him during those visits; she was affectionate and patient with him; and he was happy during the visits.  This evidence shows only that Candice and Adrian had "a loving and happy relationship" and does not mean "the juvenile court should have determined the statutory exception to termination of parental rights applied."  (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419; *In re Jason J.* (2009) 175 Cal.App.4th 922, 938 [for § 366.26, subd. (c)(1)(B)(i) exception to apply, parent must be more than " 'a friendly visitor' "]; *In re Debra M.*, *supra*, 189 Cal.App.3d at p. 1038 ["Expressions of love and concern do not equate to the day to day care and devotion the average parent expends on behalf of children."].)

Other evidence, minimized or ignored by Candice, supports the juvenile's court's finding that Candice had not shown the existence of a "significant, positive parental attachment that goes from the child to the parent."  The record indicates that after Adrian's removal at age 10 months, Candice never had primary responsibility for his care; nearly all of her visits with Adrian were supervised; in the first several months of supervised visits, Candice frequently lost patience with Adrian and called him disparaging names; when visits became unsupervised, her boyfriend bit Adrian in the

15

chest; in later supervised visits, Candice was unable to control both Audriana and Adrian; and in the more than two years Adrian lived with his foster parents, he became apprehensive about visiting Candice and talking to her on the telephone, and instead looked to his foster parents to meet his physical and emotional needs. This evidence indicates Candice's relationship to Adrian "bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship. Under these circumstances, the [juvenile] court properly concluded that section 366.26, subdivision (c)(1)[(B)(i)] was not an impediment to the termination of [Candice's] parental rights." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)

Candice also argues that in terminating her parental rights, the juvenile court did not give sufficient weight to the evidence showing that Adrian would benefit from continued contact with her. Specifically, Candice complains the court improperly deferred to the Agency's "extreme overemphasis of Adrian's bond to his foster parents"; its "unfair, specious, and just plain impermissible criticism" of her; and its fictional "notion that adoption is not just more permanent than guardianship, but also always appropriate and desirable." According to Candice, "the sum of [the] variables [affecting the parent-child bond] made a non-adoptive permanent plan the only correct outcome" in this case. We disagree.

In making these arguments, Candice relies heavily on our decision in *In re S.B.* (2008) 164 Cal.App.4th 289, 299, where we held a parent relying on the beneficial parent-child relationship exception to adoption does not have "to prove the child has a 'primary attachment' to the parent, or to show the parent and the child have maintained

16

day-to-day contact."  But we have since "emphasize[d] that *S.B.* is confined to its extraordinary facts.  It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact."  (*In re C.F.* (2011) 193 Cal.App.4th 549, 558-559; accord, *In re Jason J.*, *supra*, 175 Cal.App.4th at p. 937.)  "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.  [Citation.]  A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent."  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Here, some evidence introduced at the permanency planning hearing showed that Candice loved Adrian and wanted to regain custody of him and that he generally enjoyed her visits.  "But this is simply not enough to outweigh the sense of security and belonging an adoptive home would provide."  (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)  Other evidence showed that Adrian had recently become detached from Candice, did not want to see or speak to her, and actually considered his foster mother to be his "mommy."  It was for the juvenile court, not us, to weigh the evidence.  (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at p. 947.)  Based on the evidence and the Legislature's strong preference for adoption (§ 366.26, subd. (c); *In re Celine R.*, *supra*, 31 Cal.4th at p. 53), the "court could reasonably conclude that the absence of [Candice] from his life would result in no

significant detriment to [Adrian] and therefore was not a compelling reason for rejecting adoption" (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1317).

    2.    *Sibling Relationship*

Candice also relies on the exception to adoption that applies when terminating parental rights would be detrimental to the child because "[t]here would be substantial interference with [the] child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v).) "In enacting this exception, the legislature was concerned with preserving long-standing relationships between siblings which serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.) "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at p. 952, fn. omitted.) Factors relevant to the analysis include whether the child and the sibling were raised together in the same home, whether they shared significant common experiences, whether they have a close and strong bond, and whether continued contact with the sibling is in the child's best interests compared to the benefit of legal permanence through adoption. (§ 366.26, subd. (c)(1)(B)(v).)

The juvenile court did not specifically articulate its reasons for finding the sibling relationship did not apply, and little evidence was introduced on the matter. Candice identifies portions of the record indicating that by the time of the permanency planning hearing, Adrian had lived with Audriana in the same foster home for approximately one year; that he enjoyed playing with her and showed her affection; that he would likely miss Audriana and ask questions if she were gone; and that she was recently returned to

18

Candice's custody. But, as the Agency points out, Adrian was removed from Candice's custody before Audriana was born; he has not always shown interest in her, and often prefers to play on his own or with his foster brother; the record suggests few, if any, shared significant experiences; and there was no evidence Adrian ever said he missed Audriana or asked about her, such as to suggest a close bond between them. The Agency also points out the foster parents repeatedly stated that if they adopt Adrian, they want him to have regular visits with Audriana. There is no substantial interference with the sibling relationship where, as here, the adoptive parents would allow sibling contact. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 254.) On this record, therefore, the juvenile court reasonably could conclude Adrian and Audriana did not have a long-standing relationship that served as an anchor for Adrian while his life was in turmoil (*In re Erik P.*, *supra*, 104 Cal.App.4th at p. 404), and termination of Candice's parental rights would not so substantially interfere with the sibling relationship that it would be detrimental to Adrian (§ 366.26, subd. (c)(1)(B)(v); *In re L. Y. L.*, *supra*, 101 Cal.App.4th at pp. 952-953).

A different conclusion is not required by *In re Naomi P.* (2005) 132 Cal.App.4th 808, on which Candice exclusively relies. As we have previously explained in distinguishing that case, there "the appellant was a social services agency, and the issue was whether substantial evidence supported the juvenile court's finding that the sibling relationship exception to adoption was *applicable*. The appellate court affirmed the ruling, explaining, 'It is not our role to interfere with the trial court's assessment of the witnesses' demeanor and credibility.' [Citation.] The issue here is whether substantial

19

evidence supports the court's finding the exception is *inapplicable*, and we consider the evidence in the light most favorable to the court's ruling."  (*In re D.M.* (2012) 205 Cal.App.4th 283, 293.)

## DISPOSITION

The order terminating Candice's parental rights over Adrian and placing him for adoption is affirmed.

_____
IRION, J.

WE CONCUR:


_____
HUFFMAN, Acting P. J.


_____
HALLER, J.